NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| KAY ELLISON, | : | |
| | : | Civil Action No. 21-16230 (SDW) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Respondent. | : | |
| | : | |

**WIGENTON**, District Judge

Presently before the Court is Petitioner Kay Ellison's ("Ellison") amended motion to vacate sentence brought pursuant to 28 U.S.C. § 2255 and her memorandum in support thereof, challenging her criminal conviction and sentence in Criminal Action No. 15-622-2.  (Civ. ECF Nos. 4, 5).[1]  The Government filed an answer to the amended § 2255 motion (Civ. ECF No. 9), to which Ellison replied (Civ. ECF No. 10), and requested an evidentiary hearing (Civ. ECF Nos. 11, 12).  For the reasons set forth below, this Court will deny Ellison's amended § 2255 motion without an evidentiary hearing and will deny Ellison a certificate of appealability.

## I.     BACKGROUND

### A.     The Superseding Indictment

In December 2016, Ellison and her co-defendant, Judy Tull ("Tull"), as principle officers of Southern Sky Air & Tours d/b/a Myrtle Beach Direct Air & Tours ("Direct Air"), were charged

---

[1] This Court will cite to docket entries in this civil proceeding under § 2255 using "Civ. ECF No(s)." and will cite to docket entries in Ellison's related Criminal Action, 15-cr-622-2, using "Crim. ECF No(s)."

with an eight-count superseding indictment for their fraudulent scheme to withdraw escrowed passenger money before those passengers completed their flights. (Crim. ECF No. 44.) The Superseding Indictment charged Ellison and Tull, under Count One, with conspiracy to commit wire fraud and bank fraud, in violation of 18 U.S.C. §§ 1343, 1344. (*Id.* at 1-10.) The Superseding Indictment alleged, in relevant part, the following background:

> a. Southern Sky Air & Tours, d/b /a "Myrtle Beach Direct Air & Tours" ("Direct Air"), was a public charter company founded in or about 2006 and headquartered in Myrtle Beach, South Carolina. In or about 2007, Direct Air commenced operations as a public charter operator. A public charter operator books airline reservations and arranges for charter flights to be flown by contracted airline carriers. Direct Air offered charter services in a number of cities, including Newark, New Jersey.
>
> b. Defendant JUDY TULL co-founded Direct Air, served as its Chief Executive Officer, handled Direct Air's flight operations, and had frequent communications with Direct Air's credit card processors and its corporate depository bank, "Bank # 1." [Valley National Bank].
>
> c. Defendant KAY ELLISON co-founded Direct Air and served as its Managing Partner. Defendant ELLISON was involved in Direct Air's customer reservations.
>
> d. Robert Keilman ("Keilman"), a co-conspirator not charged as a defendant herein, co-founded Direct Air and held the title of Chief Financial Officer ("CFO"). Keilman's responsibilities included, among other things, preparing Direct Air's financial statements.
>
> e. Defendant TULL, defendant ELLISON, and others owned equity shares in Direct Air and received salaries and bonuses from Direct Air.
>
> f. The U.S. Department of Transportation ("DOT") … regulated public charter operators such as Direct Air….
>
> Among other things, DOT regulations required charter operators to protect passengers financially either by having the charter operator post a security or by having the charter operator keep passenger

2

payments for future flights in a designated depository or escrow account with an approved bank. DOT regulations further protected flying passengers by not allowing charter operators like Direct Air to receive a passenger's funds from the depository or escrow account until the passenger's flight was completed.

g. Bank # 1 was a regional bank … insured by the Federal Deposit Insurance Corporation, and was a financial institution under Title 18, United States Code, Section 20. Bank # 1 was approved by the DOT to maintain depository or escrow accounts. Direct Air maintained a depository account at Bank # 1 (the "Bank # 1 Depository Account") and caused passenger payments for future flights to be deposited into the Bank # 1 Depository Account. Direct Air and Bank # 1 agreed that these payments for purchased flights would remain in the Bank # 1 Depository Account and would not be released to Direct Air until completion of the purchased flights. Upon completion of purchased flights, defendant TULL, defendant ELLISON, or a Direct Air employee, acting at the direction of either Defendant TULL or defendant ELLISON, sent either a facsimile or an e-mail from Direct Air's office in South Carolina to Bank #1 in New Jersey requesting payment from the Bank #1 Depository Account ("Bank #1 Release Requests"). The Bank # 1 Release Requests contained information detailing the purported revenue associated with the completed flights.

h. "Bank #2" [Merrick Bank] … was insured by the Federal Deposit Insurance Corporation, and was a financial institution under Title 18, United States Code, Section 20. Bank #2 acquired, cleared, and settled credit and debit card payments made by certain customers booking flights through Direct Air. When Direct Air customers paid for their charter reservations using certain credit and debit cards, Bank #2 acquired the funds to cover the purchases and deposited the funds into the Bank # 1 Depository Account, where the funds were supposed to remain until the completion of the purchased flights. If a customer sought a refund of a credit or debit card charge, Bank #2 had to initiate a "chargeback" to recover the funds from Direct Air.

i. The "Card Processor" [JetPay] was a credit and debit card processor…. The Card Processor contracted with Direct Air and Bank #2 to process credit and debit card payments acquired by Bank #2 and deposited into the Bank # 1 Depository Account, where the funds were supposed to remain until the completion of the purchased flights. The Card Processor, acting on behalf of Bank #2, also periodically received and reviewed financial statements that

3

contained information regarding Direct Air's purported financial performance and health, and transmitted these financial statements to Bank #2 for additional review. Both the Card Processor and Bank #2 relied upon these financial statements.

j. The "Credit Card Company" [American Express] … was a bank holding company, and was a financial institution under Title 18, United States Code, Section 20. The Credit Card Company funded and processed its own credit card payments. Some Direct Air passengers paid for future flights on Direct Air using credit cards issued by the Credit Card Company. The Credit Card Company deposited funds to cover the purchases to Direct Air to the Bank # 1 Depository Account, where the funds were supposed to remain until the completion of the purchased flights. If a customer sought a refund of a credit card charge, the Credit Card Company had to initiate a chargeback to recover the funds from Direct Air and credit them to the customer's account. The Credit Card Company also periodically received and reviewed financial statements that contained information regarding Direct Air's purported financial performance and health. The Credit Card Company relied upon these financial statements.

k. Direct Air periodically offered a promotion called the "Family Ties" program, which allowed passengers to purchase vouchers redeemable for future flights. As part of the program, Direct Air divided a passenger's total payment into a "membership fee" and a separate "ticket price."

1. Direct Air ceased operations and declared bankruptcy in or about March 2012. After Direct Air ceased operations, its flights were cancelled. By this time, passengers had already purchased tens of thousands of tickets for future travel. Pursuant to DOT regulations and agreements with Bank #2, the Card Processor, and the Credit Card Company, money associated with these tickets should have been held in the Bank # 1 Depository Account and should have totaled in the tens of millions of dollars. In reality, however, the Bank # 1 Depository Account contained only approximately $1 million at the time Direct Air ceased operations. As a result, there were insufficient funds in the Bank # 1 Depository Account from which to reimburse Direct Air passengers who had prepaid for flights that were canceled upon Direct Air's termination of operations.

(Crim. ECF No. 44 at 1-5.)

The alleged conspiracy occurred between October 2007 and March 2012, the object of which was for Tull, Ellison and co-conspirator Keilman to fraudulently withdraw funds from escrow, held by Valley National Bank for Direct Air's customers, and to fraudulently conceal Direct Air's true financial condition from Merrick Bank, JetPay and American Express.   (*Id.* at 6-7.)   The alleged conspiracy was accomplished by:

> on various occasions between 2008 through 2010, defendant TULL, defendant ELLISON, and others:
>
> (a) made and directed others to make reservations for fictitious passengers in Direct Air's reservation system in order to inflate the revenue associated with completed flights; (b) submitted and directed others to submit fraudulent Bank #1 Release Requests to Bank #1 with these inflated revenue figures; and (c) canceled and directed others to cancel the fictitious reservations in Direct Air's reservation system. Defendant TULL, defendant ELLISON, and others thereby fraudulently caused millions of dollars to be released from the Bank # 1 Depository Account in the manner described in this paragraph.
>
> . . .
>
> It was further part of the conspiracy that defendant TULL, defendant ELLISON, Keilman, and others became aware of a shortfall in the Bank # 1 Depository Account and concealed that shortfall in the Bank # 1 Depository Account by submitting and causing the submission of fraudulent financial statements to Direct Air's creditors and the creditors' agents, including Bank #2, the Card Processor, the Credit Card Company, and others.
>
> . . .
>
> It was further part of the conspiracy that, the conduct of defendant TULL and defendant ELLISON would and did affect one or more financial institutions, namely, Bank #1, Bank #2, and the Credit Card Company, all within the meaning of Title 18, United States Code, Sections 20 and 3293, in that these financial institutions were exposed to a new and increased risk of loss, and suffered actual loss, in three ways. First, the defendants' conduct caused Bank # 1 to release from the Bank # 1 Depository Account monies which, at

various times, were owned by and in the custody and control of Bank # 1, Bank #2, and the Credit Card Company. Second, as a result of the defendants' conduct, and after the shortfall in the Bank # 1 Depository Account was discovered, Bank # 1, Bank #2, and the Credit Card Company engaged in civil litigation and expended monies in fees, costs, and related expenses defending their respective interests. Third, as a result of the defendants' conduct, Bank # 1, Bank #2, and the Credit Card Company risked harm to their respective commercial and professional reputations. All in violation of Title 18, United States Code, Section 1349.

(Crim. ECF No. 44 at 7-10.)

Counts Two through Five of the Superseding Indictment alleged wire fraud in violation of 18 U.S.C. § 1343 and Section 2, in connection with four facsimile transmissions sent to Valley National Bank:

[o]n or about the dates set forth below, in Passaic County, in the District of New Jersey and elsewhere, defendants **JUDY TULL and KAY ELLISON** and others having knowingly and intentionally devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, which scheme and artifice would affect financial institutions, and for the purpose of executing such scheme and artifice, knowingly and intentionally transmitted and caused to be transmitted by means of wire communications in interstate and foreign commerce the following writings, signs, signals, pictures, and sounds, each constituting a separate count of this Superseding Indictment:

(*Id.* at 11-12.)

## B.    Ellison's Opening Statement at Trial

Ellison and Tull were tried jointly beginning on March 19, 2018, and concluding on March 28, 2018.    Ellison was represented by James B. Lees, Jr, Esq. ("Lees").   When Lees presented Ellison's opening statement at trial, he told the jury that the defendants "had been waiting years to be here, to come tell their side of the story as to why the Department of Justice …   have been sold

6

a bill of goods by some bitter, bitter people to make these two women the patsies for a bankruptcy." (Crim. ECF No. 98 at 25.)   Lees also pointed to evidence that Direct Air's CFO, Keilman, became the majority stockholder in Direct Air in 2009, and this gave him the legal authority to make all of the decisions for the company.   Keilman was a CPA and a former Vice President of the Bank of New York.   His purpose for investing in Direct Air was to take the company public and make a lot of money.   When Direct Air went bankrupt, he pled guilty to financial crimes and blamed Ellison and Tull.   (Crim. ECF No. 98 at 30-31, 33-36.)

Lees argued the real story was that Direct Air sold vouchers, which were transferable certificates to be used for booking future flights. The vouchers had an expiration date, and sometimes they expired before being used.   Vouchers were not regulated by Part 380 of the Code of Federal Regulations because a voucher is not an airline ticket, it is a transferable certificate that could be exchanged in the future for a flight.   A voucher sale did not create a passenger; therefore, there was no passenger money to put in escrow under the regulations.   In May 2009, however, Direct Air, through its counsel, Aaron Goerlich, agreed to voluntarily put money from voucher sales in escrow.   Direct Air's policy was to place the portion of the money from a voucher sale that was allocated for air travel in the escrow account and make sure it remained in escrow until a passenger completed a flight using the voucher.   The other portion of a voucher sale was a membership fee, which provided free luggage transportation and other land-based benefits.   The membership fees did not have to remain in escrow.   The only money withdrawn from the escrow account by Ellison and Tull were funds derived from the membership fees on vouchers. Valley National Bank agreed that these funds could be withdrawn from escrow. Ellison and Tull meticulously kept track of what money could and could not come out of escrow.

Direct Air had an annual income over $80 million and it rented a computer system called Radixx, which was widely used in the airline industry, although it was not designed for charter airlines.   Direct Air made unintentional accounting errors, which were discovered by looking at how the computer system worked.   Radixx staff informed Ellison and Tull that the computer system could not capture financial transactions made by gate agents, such as payments for luggage or other fees.   Therefore, Ellison and Tull kept track of these transactions by hand.   Radixx was wrong, however, as the computer system captured these transactions, and this resulted in the transactions being counted twice.   The total for the transactions was $7 million.

Ellison and Tull were accused of falsifying sales for passengers who had completed flights for the purpose of illegally withdrawing money from escrow.   Lees argued there was a legitimate explanation for the fictitious flights.   When a Direct Air flight was canceled, DOT regulations required Direct Air to purchase a ticket for the passenger on another commercial flight, a practice called passenger protection.   By law, according to Lees, the passenger was no longer a passenger of Direct Air, but instead a passenger of the airline on which the passenger was rebooked. Therefore, the money originally paid to Direct Air could be taken out of escrow.   The escrow bank required only that Direct Air report the number of "protected passengers" and to simply pick a random flight to associate with the protected passengers.   This made it look like 600 or 700 passengers were on one flight, but it was not fraud because the escrow bank understood this was how protected passenger transactions were reported, rather than having to report each rebooked passenger on a particular commercial flight.   The money could legally be withdrawn from the escrow account.

Before the company was sold to Avondale, Direct Air's officers began to realize there was

8

a shortage of money in escrow, but they did not know why the numbers were off. They disclosed the escrow shortage of $5.4 million and sold the company to Avondale, which had a plan to make the company profitable again.

Direct Air kept meticulous records to establish that every penny withdrawn from escrow was legally withdrawn under the regulations, but those records were taken by the bankruptcy trustee after Avondale declared bankruptcy. After this prosecution began, Direct Air discovered that 57 of its records were destroyed when the roof collapsed in the bankruptcy trustees' storage facility. These were the documents that would have shown the calculations made by Direct Air regarding the funds they could legally withdraw from escrow. (Crim. ECF No. 98 at 25-57.)

### C.    The trial and appeal

At trial, without referring to Direct Air's voucher sales, the Government focused on allegations that Ellison and Tull sent false or misleading "Release Requests" to Valley National Bank and withdrew passengers' funds before their flights were completed, contrary to their representations that Direct Air was in compliance with DOT regulations. The Government rested after a 7-day jury trial. At that time, Lees confirmed in open court that he had conferred with Ellison, advised her of her rights, and that Ellison decided not to testify or to present a defense. (Crim. ECF No. No. 112 at 13-14, 1270.) Ellison agreed to Lees representations in a colloquy with this Court. (Crim. No. ECF No. 113 at 5-6.) Thus, in Ellison's closing argument at trial, Lees stated:

> And believe me, we do not take lightly the fact that in consultation with my client, given what they have presented in this courtroom, we have chosen to end this and not go forward with the evidence. And go to you today and say, under the law, there is no case. There should be an acquittal, if you follow the law.

> That is a trust we have in your ability and your intellect to apply the law that is going to be given to you tomorrow morning by your Honor.

(Crim. ECF No. 112 at 82-83.)

On March 28, 2018, the jury convicted Ellison on all counts.   (Crim. No. ECF No. 108.) Ellison was sentenced on November 28, 2018, to a 94-month term of imprisonment, 5 years of supervised release, and ordered to pay $19,663,429.50 in restitution.   (Crim. No. ECF No. 139.) An amended judgment was filed in February 2019.   (Crim. No. ECF No. 156.)   After briefing on post-trial motions, this Court denied Ellison's motion for judgment of acquittal and for a new trial.   (Crim. No. ECF No. 119.)   Upon Ellison's appeal, her conviction and sentence were affirmed by the United States Court of Appeals for the Third Circuit on February 12, 2020. *United States v. Ellison,* 804 F. App'x 153 (3rd Cir. 2020).[2]

---

[2] On appeal, Ellison and Tull argued, in part, that their convictions should be overturned for lack of evidence because the Government did not distinguish between "the improperly withdrawn monies from those validly taken out of escrow. And as a result, they conclude, it cannot prove which withdrawals violated DOT regulations."   *Ellison*, 804 F. App'x at 157.   The Third Circuit held:

> [b]ut the elements of all three charged offenses center on whether there was a scheme to defraud through false representations. Here, the evidence established that the escrow release requests hinged on inflated passenger rosters. It also shows that Defendants were aware of the growing deficiency in the escrow account, and they took active steps to conceal Direct Air's financial condition. A rational jury could find that this shows that the escrow requests were part of a scheme to defraud, as those requests triggered the improper release of at least some funds. That is enough for both bank and wire fraud.

*Id.*

## II.  DISCUSSION

### A.  Legal standard

A prisoner in federal custody may file a motion under 28 U.S.C. § 2255 to challenge the validity of his or her sentence.   Section 2255 provides, in relevant part, as follows:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such a sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255.   When determining a pro se § 2255 motion, courts must accept "as true the allegations of the petitioner, unless they are clearly frivolous."   *United States v. Travillion*, 759 F.3d 281, 293, n. 23 (3d Cir. 2014) (quoting *Moore v. United States*, 571 F.2d 179, 184 (3d Cir. 1978)).   An evidentiary hearing on a motion to vacate is not required where "the motion and files and records of the case conclusively show that the prisoner is entitled to no relief."   *United States v. Booth*, 432 F.3d 542, 545 (3d Cir. 2005) (quoting R. Governing § 2255 Cases R. 4(b)).

### B.     Ellison's amended § 2255 motion and memorandum of law

Ellison presents the following sole ground for relief in her amended § 2255 motion:

> Mrs. Ellison was deprived of the effective assistance of counsel in preparation for and during trial, as a result of counsel's failures: 1) to present Mrs. Ellison's testimony which he had promised the jury in his opening statement; and 2) to present the defense witnesses who had been prepared to testify in Mrs. Ellison's defense at her trial.

(Civ. ECF No. 4 at 5; Civ. ECF No. 5 at 6 (capitalization altered)).

11

Ellison submitted a declaration in support of her amended § 2255 motion, wherein she asserts that she participated in a mock trial to determine the value of her truthful exculpatory testimony, and the mock jury acquitted her.   (Civ. ECF No. 1-1, ¶ 6.)   Therefore, she alleges that no reasonable attorney would have failed to present her testimony, which the jury was expecting to hear after her counsel's opening statement.   (Civ. ECF No. 5 at 7-8.)   She argues that her counsel was likewise professionally unreasonable by failing to present the testimony of Ellison's many exculpatory witnesses because their testimony would have resulted in a reasonable probability of acquittal.   (Civ. ECF No. 5 at 9.)

Ellison submitted a copy of an October 2017 email from Lees to herself:

> I [] believe [] that we have a decent defense and that for each allegation being made by the government I do have a viable position that argues against criminal activity. Ultimately however conviction or acquittal at trial will rest primarily upon your performance when you are on the witness stand at trial. I do not believe you can be acquitted at trial without taking the stand and testifying.

(Civ. ECF No. 5 at 11, citing Ex. 2.)

At the close of the Government's case at trial, Lees advised Ellison that the Government had not presented sufficient evidence to convict, and her testimony would only lead to jury confusion.   (*Id.* at 11-12.)   Ellison claims that Lees incorrectly told her that if she did not testify, she would not be allowed to present any of the defense witnesses.   (*Id.* at 12, n. 8.) Ellison expressed her concern to Lees about his opening statement "promising the jury [her] testimony," but after more than two hours of discussion, Ellison acquiesced in his advice not to put on a defense.   (*Id.* at 12, n. 9.)   Ellison alleges her counsel's advice was motivated by his desire to save himself days of labor presenting witnesses at trial.   (*Id.* at 14.)   Ellison argues

that she was prejudiced by ineffective assistance of counsel because she was deprived of the opportunity to contest key facts essential to the Government's case, which she and her exculpatory witnesses were prepared to contest.   (*Id.* at 17-18.)

## C.   The Government's answer

The Government contends that Ellison and her counsel agreed on a strategy not to put on a defense because they believed that the Government had not proven its case.   (Civ. ECF No. 9 at 2.)   Further, by virtue of her colloquy with the Court where she represented that it was her decision not to testify or put on a defense, Ellison waived her allegation that counsel told her the defense witnesses could not testify unless she did.   (*Id.* at 2.)

Alternatively, the Government argues that a hearing is unnecessary because Ellison has failed to show prejudice.   (*Id.*)   The Government submits that the defense testimony would have been cumulative to the opening statement, cross-examination and summation, and, if presented, could have confused the jury.   (Civ. ECF No. 9 at 13-14.)   Contrary to the email presented by Ellison, where Lees suggested to her that she would need to testify if she hoped for an acquittal, the Government notes that Lees also sent Ellison an email before trial, advising her of the substantial likelihood that she would be convicted based on the documentary evidence and co-conspirator testimony.   (*Id.* at 16-17, citing Ellison's Ex. 2.)   Although Lees had told the jury in his opening statement that the defendants were anxious to testify, he explained in closing argument that he did not put on a case because the Government failed to meet its burden.   (*Id.* at 17.)   Finally, the Government contends Ellison's assertion that Lees' strategy was motivated by his desire to avoid additional work is frivolous, based on the amount of work he put into the case. (*Id.* at 18.)

13

D.      **Ellison's reply brief**

In her reply brief, Ellison contends that she is entitled to an evidentiary hearing because she has declared under oath that Lees told her she could not present defense witnesses if she did not testify herself, and the Government has not refuted this allegation.   (Civ. ECF No. 10 at 2.) Ellison argues that her acquiescence to counsel's advice does not speak to the adequacy of the advice.   (Civ. ECF No. 10 at 7.)   Thus, she concludes that because she has made a prima facie showing of ineffective assistance, her counsel must be called to testify.   (*Id.* at 9-10.)

Ellison submitted a declaration summarizing the nature of her proposed testimony and that of the defense witnesses.   (Civ. ECF No. 1-1.)   Additionally, Ellison seeks to present the testimony of her exculpatory witnesses at an evidentiary hearing in order to make a showing of prejudice.   Ellison maintains that defense counsel's arguments to the jury cannot replace defense witness testimony because counsel's arguments are not evidence.   Therefore, she claims prejudice by counsel's failure to put on a defense.

E.      **Sixth Amendment ineffective assistance of counsel standard of law**

To state a claim of ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner must show that counsel's performance was deficient.   *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *United States v. Travillion*, 759 F.3d 281, 289 (3d Cir. 2014) (quoting *Strickland*.)   The petitioner must show that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."   *Id.* at 687; *United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007).   The standard for attorney performance is that of objectively reasonable assistance under prevailing professional norms.   *Id.* at 687-88. Determination of the objective reasonableness of counsel's performance is made under all of the

14

circumstances and from counsel's perspective at the time, without relying on hindsight. *Id.* at 688-89.

Even when a petitioner is able to show that counsel's representation was deficient, the petitioner must still demonstrate that counsel's deficient performance prejudiced the defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *Shedrick*, 493 F.3d at 299. "[N]ot every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding" *Id.* at 693. However, "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* Instead, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "Because failure to satisfy either prong [deficient performance and prejudice] defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [citing *Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

### F. Analysis

This Court will first address the prejudice prong of *Strickland* because it is dispositive of this matter.   A petitioner's "failure to include a sworn statement regarding the nature of [defense witnesses'] proposed testimony is fatal to his making a prima facie showing of prejudice." *Tolentino v. United States*, No. CIV.A. 13-4168 WJM, 2014 WL 3844807, at *3 (D.N.J. July 31, 2014) (citing *Duncan v. Morton*, 256 F.3d 189, 202 (3d Cir. 2001) (additional citations omitted). Petitioner has not included sworn statements from her proposed defenses witnesses.   Moreover, even accepting as true Ellison's statements of the nature of her proposed witnesses' testimony, she has not established a prima facie showing of prejudice.   To determine prejudice under *Strickland*, this Court considers whether there is a reasonable probability, "sufficient to undermine confidence in the outcome" that if Ellison had testified herself and presented the testimony of her proposed witnesses, the jury would have acquitted.   To begin the prejudice analysis, this Court looks to the closing arguments for a summary of the evidence presented at trial and the arguments made by counsel.[3]

### 1. The Government's closing argument

After trial, the Government summarized its case in closing argument.   (Crim. ECF No. 112 at 57-80.)   The Government asked the jury to focus on seven lies in letters prepared and signed by Ellison and Tull, which were sent to Valley National Bank to steal passengers' money. According to Direct Air stockholder Ed Warneck's ("Warneck") testimony, these letters falsely inflated the amount of money Direct Air was entitled to withdraw from the escrow account for

---

[3] A summary of co-defendant Tull's closing argument and the Government's redirect in closing are omitted.

16

actual completed flights.   Lisa Swafford Brooks ("Brooks") from the DOT testified that a DOT regulation, referred to as Part 380, protected passengers' money, with limited exceptions, by requiring all passengers' money to be held in an escrow account until after the passengers' flights were completed.   Aaron Goerlich ("Goerlich"), Direct Air's aviation lawyer, described the same basic rule.   Lori Rooney ("Rooney") from Valley National Bank testified that she took Direct Air's Release Request letters for withdrawals from escrow at face value.   She did not know why the numbers were inflated.   However, Warneck explained that the letters falsely inflated income by adding in exorbitant cash lines, some reflecting as high as $50,000 to $100,000 in cash payments for a single flight, which never happened with a discount carrier like Direct Air.

Mary Ann Jarrell ("Jarrell"), employed in Direct Air's reservation center in West Virginia, testified as to how she created reports for Release Requests upon Ellison's orders. Ellison, her boss, would call her and tell her to "dummy up reservations" for flights that were already completed.   Jarrell would open up reservations from the past, trips that had already taken place, and she would add fake passengers to flights.   She had to make the reservations using a cash entry because she did not have a credit card for this purpose.    Ellison would tell her to cancel the reservations after making them, which would make sense if she needed to know how much money Direct Air actually had, not including cash from the false sales.   Jarrell "freaked out" when Ellison called her on the last day Direct Air was in business and told her to get her purse and go home.   Ellison told Jarell that she was having a bad day because she was $24 million in debt.   The Government argued this was tantamount to a confession because the debt represented the consequences of her crimes.

While Jarrell could not explain why Ellison had asked her to falsify passenger

17

reservations, Diane Drummond, who worked at Direct Air's headquarters in Myrtle Beach, testified that Tull and Ellison were the people in charge at Direct Air.   They paid the bills, including the fuel bills.   They were the only two people at Direct Air who were allowed to look at the daily fax from the escrow bank.   Keilman's testimony explained why no one was allowed to look at the escrow account statements, because the statements told the grim reality that Direct Air had insufficient funds.   Keilman admitted that and he and the defendants added the balance of the escrow account to the company's net income to make the company look like it was making money when, in reality, it was losing money.   They all knew this was wrong but lied to the credit card companies and banks because Direct Air could not continue to do business without their services.   They hoped to keep the company alive and sell it for a profit.

Referring to Keilman's testimony about Direct Air's year-end financial statements, the Government submitted that over the course of Direct Air's existence, while Direct Air's internal financial documents showed net year-end losses ranging from $700,000 to $3.4 million, Direct Air was submitting external financial statements to Merrick Bank and American Express that showed yearly profits ranging from $200,000 to almost $2 million.

**2.      Ellison's closing argument**

In Ellison's closing statement at trial (Crim. ECF No. 112 at 81-115), Lees argued on her behalf that the Government had failed to prove she committed any of the crimes charged.   First, Lees attacked Keilman's credibility based on his testimony that he had entered into an agreement with the Department of Justice, which permitted him to receive a lighter sentence for testifying against Ellison and Tull.   Keilman admitted that he lied to the Government in interviews leading

up to his prosecution, and that he had lied to Direct Air's bankruptcy trustee. Lees posed the question: "Why did the Department of Justice believe Keilman now?"

Next, Lees argued that it is not a crime to steal your own money.   Joseph Pabst ("Pabst") from American Express testified that the money held in Direct Air's escrow account with Valley National Bank was deferred revenue, specifically, that it was Direct Air's revenue.   Thus, it was not a crime to take the money out of escrow.   Further, Lees noted the indictment charged Ellison with obtaining money owned by or in the custody and control of Valley National Bank, Merrick Bank, and American Express, but that the Government had not presented any evidence that Merrick Bank or American Express owned or had the escrow money in their custody and control. With respect to Valley National Bank's "custody and control" of the escrow account,   Lees pointed to Rooney's testimony that Valley National Bank did not own the money in the escrow account.

Lees then explained the importance of Direct Air's voucher sales.   Warneck testified that Direct Air, through its Family Ties program, sold vouchers that included a membership fee and a transferable certificate for the future booking of a charter airline ticket.   In 2009, the DOT opened an enforcement investigation into Direct Air's Family Ties program but closed the investigation without taking any action.   Ellison and Tull continued to sell vouchers on the advice of their aviation counsel, Goerlich.   Goerlich testified that he was surprised when the DOT reopened the investigation in 2011, and the DOT admitted it made a mistake by not enforcing the prohibition on voucher sales in its earlier investigation of Direct Air.   It was only after Direct Air went bankrupt that the DOT issued its clarifying statement that it would consider voucher sales by charter airlines a per se violation of its rules.   Lees suggested that after the DOT misled Ellison

and Tull into believing voucher sales by charter airlines were permitted, it was wrong for the Government to charge Ellison with a crime for selling vouchers and taking money from voucher sales out of the escrow account.   Lees concluded that the Government did not prove any crime had been committed because it did not distinguish between the money that Ellison permissibly withdrew from the escrow account for voucher sales from money that came from passengers who held a confirmed ticket but had not yet flown.

Lees then explained to the jury that it was only the manner in which the requests for withdrawal of escrow funds were made that was problematic, not that the money was impermissibly withdrawn.   He referred to an email between Ellison and Jarrell, the reservation supervisor at Direct Air.   Jarell informed Ellison that Troy at Radixx, the company from which Direct Air leased their airline computer system, told her they had to enter a booked date and a canceled date in the system to record an instance where Direct Air had to purchase a scheduled airline ticket for a customer whose charter flight was canceled.   Thus, Lees suggested that the sales numbers reported in the Release Requests to Valley National Bank were not inflated because they included not only the number of sales for charter flights that had been completed, but also the sales of charter flights which were canceled and Direct Air had purchased a scheduled airline ticket for passenger accommodation.   Rooney from Valley National Bank testified that once a scheduled airline received money for a rebooked passenger, it was the scheduled airline that was required to keep the funds in escrow until the flight was completed.   Lees concluded that Ellison's requests for release of funds from escrow were not fraudulent but instead were requests for funds that Direct Air was permitted to withdraw.

Lees then turned to the issue of the sale of Direct Air to Avondale.   He argued that Ellison and Tull were merely employees of Avondale after Avondale purchased Direct Air on September 29, 2011.   Jeff Conry ran the company for Avondale after the sale.   Keilman testified that the $5.4 million escrow shortage was properly disclosed to Avondale prior to the sale.   Lees argued that the escrow shortage was the result of a problem Direct Air had discovered with the Radixx computer system, and there was no intent to deceive any buyer of Direct Air regarding the shortfall. Avondale had a plan to make up Direct Air's shortfall and become profitable by using bigger planes for the charter flights.   Lees suggested that Avondale's decision to declare bankruptcy in 2012 caused the loss suffered by Direct Air's customers when it ceased operations.   Keilman testified that all of the sales made by Direct Air prior to its sale to Avondale came from completed flights or vouchers which had expired, leaving the responsibility of the $5.4 million shortfall on Avondale.   Lees stated the only reason Ellison and Tull were charged with a crime was so Keilman could receive a lighter sentence.

Finally, Lees addressed the profit and loss statements.   Keilman testified that Ellison and Tull told him to lie on the financial statements, but what they actually told him was to report the dollar amount from the escrow account as an asset on the profit and loss statements, and this was a legitimate way to report deferred revenue, according to the testimony of Joseph Pabst from American Express.   This was the heart and soul of the case, Lees told the jury, and it was not a lie because the escrowed amount should be reported under sound accounting principles.   He explained, "there's a liability to customers, and that liability is offset on the asset side of the balance sheet with cash, a cash entry. They [the prosecution] would not dare bring an accountant in here because that's the explanation, and thank God Pabst was here to give it."   (Crim. ECF No.

112 at 108.)   Lees sought to persuade the jury that Keilman had the most to lose if Direct Air failed, he had the most experience in accounting, and he was solely responsible for covering up any accounting errors and putting the blame on others to receive a lighter sentence.   (*Id.* at 109.)

### 3.    Proposed defense testimony

To determine whether Ellison was prejudiced by the advice not to testify or call defense witnesses, the Court considers Ellison's proposed testimony, stated in her declaration:

- She was not guilty

- She was being used as a scapegoat by the cooperators

- Why they handled passenger protection in the way they did

- That she never signed a charter filing

- She was only put on the account in 2010 because Judy Tull's health was failing

- The first time she filed a report, she called Valley National Bank and sent two reports, one with and one without cash protection

- About the limitations of the Radixx Reports versus the Radar Reports

- Radixx knew there were issues that a Charter Carrier needed versus a Scheduled Carrier, and Radixx did not tell them about the report being off, and what that meant to Direct Air

- How the Family Ties process worked and when they [vouchers] expired

- What happened on the day Ellison called the reservation center and Mary Ann Jarrell would not come to the phone (contesting that they spoke to each other).

Further, Ellison submits, verbatim, how she expected the defense witnesses would have testified:

22

- Amber Bostic — Advance Technology. The defense's expert on computer programming and coding errors. She was going to testify that the Radixx reporting system was off as much as 6% due to coding error. She had worked all the codes and knew what the exact issues were. She was going to testify about the limitations of Family Ties and how the system would not auto-cancel memberships. The memberships were canceled by the reservationist and could have human error. Also how many were used and how many were never used. The protection of passengers was another area she was to cover…explaining the total number of cancelled passengers and how much was recommended for protection.

- Shawn Ulerup —Management in the reservation center. He was going to explain system limitations, manual refund limitations, and the reservation policy on Family Ties memberships. He would have told the jury [that] Mary Ann Jarrell refused to come to the phone the day the company closed and that she refused to talk to me.

- Theresa Randall—Protection Supervisor and over the recommendation desk. She would have testified to the large number of protections and the policies of the company.

- Kevin Tull—Judy Tull's son who worked for the company as contract labor for the first year and trained Keilman on balancing the escrow. He explained the rules and helped Keilman set it up and the credit card processing. He would have testified what Keilman said about his knowledge and involvement was a lie.

- Reese Boyd—the corporate lawyer who came in and out of our office every day. He spent most of his time working with Direct Air. He personally meet [sic] with Keilman and knew everything about what everyone said or did within the company. And he was prepared to say Keilman was lying.

- Ron Peri—a longtime friend to Marshall and me. He was the owner of Radixx. He had come clean and told me that the Radixx Reports had issues and the coding was lost when the guy who developed it left the company. He was scrambling to get Radar [the new software program] up but knew that it was an issue.

23

- Chris Jenson—Senior VP at Radixx. He told me he would come into court and tell the truth; that Radixx had issues and what they were. After being the number 2 guy and leaving the company, they settled with him with a contract not to tell what was wrong but under oath he would have to tell and it would not have affected his contract.

- Jessica Murphy—Bankruptcy Trustee's Counsel. Would have testified about the destroyed documents and the hidden documents. She would have had to come clean about the time that the documents were destroyed and if and why she had these documents.

- Penny Bly-Keeper of the BK Direct Air Documents and worked on accounting. She could have testified about missing docs and her Direct Air inaccurate accounting.

- Greg Lukenville—President of Sky King. Knew the involvement of Keilman and new owners (their issues of the past). Keilman told Lukenville during a meeting that he was running the show.

- Avondale-New Owners-Jeff Conry, Wayne Greene CFO, Hank Torbert, and Donald Stukes. They would have testified against each other about intent for the company, and who was running what.

- Mary Baldwin. She would have testified about what her boss Robert Keilman did or did not do. She was offered help getting a job [and] basically kept up the Keilman story.

(ECF No. 1-1, ¶¶10-11.)

**4.    The defense theory**

Based on Lees' opening statement, the defense theory was as follows:   1) that the escrow shortfall was created by undisclosed flaws in the Radixx computer system; 2) Ellison's representations to Valley National Bank in support of escrow withdrawal requests were not intended to deceive but were withdrawals permitted under DOT regulations, specifically revenue

from membership fees from voucher sales and refunds to Direct Air for rebooking passengers on scheduled flights; 3) Keilman was actually running Direct Air and acted alone in falsifying the financial statements; and 4) the sale of Direct Air to Avondale exonerated Ellison for the shortfall in escrow.

The proposed defense testimony relies on the same defense theory presented by Lees, but without the benefit of not exposing any of the defense witnesses to cross-examination.   Ellison claims that the defense testimony would contest the key facts essential to the Government's case, but she does not explain why they jury was more likely to believe the defense witnesses' testimony.   For the reasons discussed below, there is not a reasonable probability that the jury would have been persuaded to acquit.   The proposed defense testimony on each aspect of the defense is discussed below.

**a.**      **Keilman's credibility**

Ellison submits she would have testified that she was not guilty and was a scapegoat for the cooperators.   This was the theme of the defense and was presented in opening and closing statements by defense counsel.   While it is true, as Ellison asserts, that an attorney's argument is not evidence,[4] Lees referred to the evidence in the record that supported the defense theory. Ellison has not provided any reason why the jury was any more likely to believe the same defense theory if she had testified that she was not guilty and merely a scapegoat.   As discussed further below, Ellison would have been subjected to difficult cross-examination.

In support of her argument that Keilman lied about the conspiracy, Ellison would have presented the testimony of Kevin Tull, Judy's Tull's son, who worked for Direct Air for its first

---

[4] *See* Jury Charge, Crim. ECF No. 113 at 17.

25

year and trained Keilman on balancing the escrow.   He would have testified, according to

Ellison, "what Keilman said about his knowledge and involvement was a lie."   Keilman testified

that Kevin Tull had experience using QuickBooks for a charter airline's accounting, and he set

up QuickBooks and showed Keilman and Baldwin how to use it.   (Crim. ECF No. 110 at 221-

22.)

  When Lees asked Keilman about their accounting method, Keilman explained:

> QuickBooks kept track of everything coming in and out of -- in
> and out on a cash basis, and that's how virtually how we ran the
> company. I am not sure I answered your question. But we ran the
> system with QuickBooks on an accrual – cash basis principally and
> only accrued for big items.

 (*Id.* at 224.)   Lees, implying that it was highly irregular to use a hybrid cash/accrual basis of

accounting, questioned how their balance sheets work.   Keilman responded, "[p]rincipally, on a

cash basis, because it was a cash business so the records always reflected that."   Keilman did not

remember if he had told Ellison and Judy Tull that he accrued "some of the big items[,]" which

meant including anticipated versus actual financial transactions.   (*Id.* at 225-26.)   To explain

why Ellison would have told Keilman to include the escrow account balance in the financial

statements, the basis for the charges of falsely inflating the income in the year-end financial

statements, Lees suggested that Direct Air moved from accounting on a cash basis to an accrual

basis in order to capture income that would be coming in from future flights based on voucher

sales.   (Crim ECF No. 110 at 228-30.)   Keilman denied this explanation and admitted to their

wrongdoing, "we put the money in the escrow account that wasn't ours on the balance statement

and income statement."   (*Id.* at 231.)

  Joseph Pabst from American Express testified that he asked Keilman, by email, how

Direct Air reported deferred revenue from its escrow account in its balance sheets.   (Crim. ECF No. 111 at 147.)   Pabst explained that when a passenger buys an airline ticket for a future flight, the money goes into a deferred revenue account in the balance sheet.   (*Id.* at 146-47.)   Because the airline has a liability to the customers until the flights are completed, the liability "is offset on the asset side of the balance sheet with cash."   (Crim. ECF No. 111 at 147.)   Pabst agreed that Direct Air's financial statements should have the Valley National Bank escrow balance on the liability side of the statement with a corresponding offset on the asset side.   (*Id.*)   But Keilman, in a phone call, told Pabst that they did not include a deferred revenue account on their balance sheet because it was not their money.   (Crim. ECF No. 111 at 147.)   In other words, Direct Air was accounting on a cash basis.   Keilman told Pabst that the Valley National Bank account reported in the balance sheet *was not an escrow account,* but an account that received money from the escrow account for flights that were already completed.   (*Id.* at 149-50.)   This was not true.   Keilman testified that he reported the escrow account balance as income upon Ellison's direction.   Assuming Ellison and Kevin Tull would have testified in support of Lees' argument that the escrow balance was properly reported on the income and balance sheets on an accrual basis, they would have been subject to cross-examination on this contrary evidence.

Ellison further submits that Reese Boyd ("Boyd"), Direct Air's corporate lawyer, would have testified that he "personally meet [sic] with Keilman and knew everything about what everyone said or did within the company. And he was prepared to say Keilman was lying."   This proposed testimony is too vague to explain how it would have persuaded the jury to acquit, in light of the evidence of Ellison's involvement from other witnesses.

Next, Ellison proposes that Mary Baldwin ("Baldwin"), Direct Air's bookkeeper, "would

have testified about what Robert Keilman did or did not do. She was offered help getting a job basically kept up the Keilman story."   Keilman pled guilty to conspiracy to commit bank and wire fraud.   Thus, it is not clear how testimony about what he "did or did not do" would have tended to exonerate Ellison.   Further, Baldwin would have been subject to cross-examination on the difference between Direct Air's internal documents showing losses each year and the external financial statements showing profits, and questioned about who would have input and access to each of those statements.   This could have harmed the defense.

In a further attempt to attack Keilman's credibility, Ellison submits that J. Greg Lukenville, President of Sky King, "knew the involvement of Keilman and new owners [Avondale] (their issues of the past).   Keilman told Lukenville during a meeting that he was running the show."   Given the evidence at trial of Ellison's signature on Release Requests to Valley National Bank and testimony that Ellison and Tull ran the business, and in particular, that they paid the bills and managed the escrow account, the proposed testimony that Keilman was running the show at the time of the sale of Direct Air to Avondale would do little to sway the jury.

**b.      Whether passenger protection explains the cash sales reported on the Release Requests**

The defense's explanation at trial for the "dummy reservations" was a practice called passenger protection.   Direct Air created a record to submit to Valley National Bank for reimbursement of passenger money, after Direct Air had purchased flights on scheduled airlines to accommodate passengers whose charter flights were cancelled.   According to the defense, once Direct Air paid the scheduled airlines to rebook the passengers, they could withdraw the passengers' money from escrow, and it was up to the scheduled airlines to maintain passengers'

28

money in escrow until the flights were completed.   Ellison states she would have testified "why they handled passenger protection in the way they did."   This does not add anything to the information Lees brought out on this subject in cross-examination.

Ellison further proposed to testify that "the first time she filed a report, she called Valley National Bank and sent two reports, one with and one without cash protection[.]"   Theresa Randall, the protection supervisor at Direct Air, would have testified to "the large number of protections and the policies of the company."   Amber Bostic, the defense's computer expert, would have explained "the total number of cancelled passengers and how much was recommended for protection."

The proposed defense testimony raises difficult questions for cross-examination.   If Direct Air experienced many flight cancellations where passengers were protected in this manner, why were there so few Release Requests supported by large cash sales, and none in 2008 or 2011?   Rooney from Valley National Bank testified that before money could be released from the escrow account, Valley National Bank would also have to receive notification from the specific air carriers "that they did in fact fly a particular flight."   (Crim. ECF No. 101 at 114.)   The dummy reservations described by Jarrell did not provide a flight by flight reporting of funds from escrow, so how were the funds released upon confirmation from the specific air carriers on which the passengers were rebooked?

Along the same lines, Brooks from the DOT testified that even if a charter company bought a ticket for a passenger on a scheduled flight after cancellation of a charter flight, the money had to be escrowed until the flight was completed.   (Crim. ECF No. 98 at 75-79.) Brooks explained the typical practice was to transfer the funds from the charter airline's escrow

account to the scheduled airlines' escrow accounts, because if the money was simply withdrawn

by the charter airline after buying the passenger a new ticket "we would never really know what

carrier had the money, how much was paid, and we wouldn't know how much the public charter

operator would have been entitled to."  (Crim. ECF No. 98 at 79.)   Goerlich, Direct Air's

aviation counsel, testified that under the DOT regulation there has to be flight by flight

accounting in escrow, matching passengers to flights.   (*Id.* at 66-67.)   Based on the record as a

whole, the proposed defense testimony regarding passenger protection was not likely to persuade

the jury that Direct Air only withdrew money from escrow that represented flights completed by

real passengers.

**c.**     **Ellison's role in Direct Air**

Ellison submits she would have testified that she never signed a charter filing, and that

she was only put on the [escrow] account in 2010 because Tull's health was failing.   Testimony

and evidence admitted at trial established that Direct Air made various representations to Valley

National Bank, American Express and Merrick Bank that Direct Air was in compliance with

DOT regulations.   Warneck, Jarrell, Drummond, and Keilman testified that Ellison and Tull,

based on their decades of airline experience, ran the company, and this was consistent with

their biographies on Direct Air's website.   (Crim. ECF No. 98 at 106, 112-16; Crim. ECF No.

101 at 29-30, 173; Crim. ECF No, 110 at 123).   Warneck and Keilman testified that Tull and

Ellison managed the escrow account.   (Crim. ECF No. 98 at 124-26; ECF No. 110 at 136-37.)

Jarrell testified it was Ellison who directed her to create the dummy reservations. (Crim ECF No.

101 at 183-85.)   The reason that Ellison became a signatory on the escrow account does not

suggest that she was not involved in the conspiracy.

**d.      Whether the total escrow shortfall was caused by unknown errors in the Radixx computer system**

Ellison proposes that she would have testified about the limitations of the Radixx Reports, and that Radixx knew there was a problem with the software and did not disclose the reports being off.   Amber Bostic, the defense's expert on computer programming and coding errors, would have testified that the Radixx reporting system was off as much as 6% due to coding error.   Direct Air employee Shawn Ulerup would have "explain[ed] system limitations, manual refund limitations."   Ron Peri, owner of Radixx, would have testified that he admitted to Ellison that the Radixx Reports had issues and the coding was lost when the developer left the company.   Chris Jenson, Senior VP at Radixx, would have testified about the issues with the Radixx reports.

In opening argument, Lees suggested the evidence would show that the escrow shortage was caused by Radixx computer errors, unknown to Ellison at the time of the alleged false representations in the escrow Release Requests.   The resulting escrow shortfall of $5.4 million was properly disclosed to Avondale, which assumed responsibility for the shortfall when it purchased Direct Air.   Therefore, there was no crime.   The proposed testimony by Ellison and others was not likely to have persuaded the jury to acquit for several reasons.   First, if there was no crime because the shortfall was caused by unknown computer errors and it was properly disclosed to the purchaser, why did Keilman plead guilty?   Second, if the escrow shortfall was only $5.4 million, and Direct Air was losing an average of $2 million dollars per year, how did the company pay its bills until it went bankrupt because it could no longer pay for fuel?   (Crim. ECF No. 110 at 92-96.)   On cross-examination, the defense witnesses would be subject to questioning about testimony that Ellison and her co-defendant handled the escrow account,

would not allow anyone to see the daily fax containing the escrow balance (Crim. ECF No. 110 at 88), and they told Baldwin what bills to pay and when.   (Crim. ECF No. 110 at 89, 120, 137.) This evidence is inconsistent with Ellison being unaware of the cause of the escrow shortage.

Finally, the proposed defense testimony about the $5.4 million escrow shortfall does not address Keilman's testimony that the shortfall was closer to $20 million, and that the disclosure to Avondale, prepared by Ellison from a report from the Radixx computer system, was misleading because they intentionally made it difficult for Avondale to figure out the true shortfall.   (Crim. ECF No. 111 at 65-66.)   The gross revenue in the disclosure to Avondale included $7 million dollars in membership and luggage fees that they had taken out of escrow, which was required to be replaced because the passengers were entitled to refunds.   (*Id.* at 67.) Avondale would have to discover on its own how to determine the total escrow shortfall because the Radixx Report did not tell the whole story:

> the total shortage would be the difference between the eighteen
> million seven seventy-one and the eleven million nine shown
> between gross revenue and net, or an additional $7 million has to
> be added to the five million four and has to be added to the seven
> million zero seven seven.

(Crim. ECF No. 111 at 94-95.)   In other words, there was another $14 million escrow shortfall at the time of the disclosure.   The proposed defense testimony does not address this key testimony.

**e.      The relevance of Direct Air's voucher sales**

According to Ellison, the voucher sales were important to establish that no crime was committed.   Ellison would have testified "how the Family Ties process worked and when they [vouchers] expired[.]"   Direct Air employee Shawn Ulerup would have explained "the

32

reservation policy on Family Ties memberships."   This, however, does not address the

testimony that the jury heard from Goerlich, Direct Air's aviation counsel.   He testified that

when the DOT opened an investigation into Direct Air's Family Ties program in 2009, Direct

Air explained to him how they managed the program.   (Crim. ECF No. 101 at 74-76.)   He

reported this to the DOT, but the information that he was provided was incomplete.   (*Id.* at 76.)

It did not account for the fact that Direct Air did not keep the membership fees in the escrow

account until the flights were completed.   (Crim. ECF No. 101 at 77-78.)   Therefore, when

Direct Air had to refund membership and luggage fees for vouchers that were unused, it created

a shortfall.   This was corroborated by Keilman's testimony that the $5.4 million shortfall did not

include the $7 million that had to be returned to the escrow account for membership and luggage

fees.   (Crim. ECF No. 111 at 66-69.)

Whether revenue from the voucher sales was withdrawn from the escrow account in

compliance with the DOT regulation was a question of fact for the jury to decide.   Brooks from

the DOT testified that a voucher program does not provide protection of consumer funds under

the escrow provisions.   (Crim. ECF No. 98 at 87-88.)   She explained,

> [y]ou were not supposed to sell vouchers if you were a public
> charter operator because the rules specifically say any money you
> take from consumers has to go in a specific flight account. If you
> did not purchase a ticket for a specific flight the rules do not apply,
> that is why we don't allow vouchers.

(*Id.* at 88.)   Goerlich testified similarly, that the voucher program was incompatible with the

regulations, which required accounting for sales on a flight by flight basis.   (Crim. ECF No. 101

at 81.)   Goerlich also testified that he warned Direct Air of the risk of future DOT enforcement

after DOT closed the 2009 investigation, but Direct Air decided to accept the risk because the

voucher program was important to them.   (*Id.* at 75.)   Given this testimony, Ellison's and

Ulerup's explanation of how the Family Ties program worked and the defense theory that taking

money out of escrow for membership fees was permitted does not raise a reasonable probability

of a different outcome at trial.

**f.      The credibility of Jarell's testimony**

Jarell, Direct Air's reservations center supervisor, testified that on the last day Direct Air

was in business, Ellison called her and told her to go home because the company was shutting

down and the Department of Transportation or IRS was coming.   (Crim. ECF No. 101 at 196.)

Ellison told Jarell that she was having a bad day because she was $24 million in debt.   (*Id.* at

197.)   In closing argument, the Government described this phone call as tantamount to a

confession.   (Crim. ECF No. 112 at 66.)     Ellison asserts she would have testified that she

never spoke to Jarell because Jarell refused to come to the phone, and Shawn Ulerup, a manager

in the reservation center, would have corroborated Ellison's testimony.

The defense contested Jarell's testimony at trial.   Lees impeached Jarell because she

gave different accounts of the phone call in interviews with the Department of Justice on several

occasions.   Jarell testified on redirect examination, that even if she did not recall the correct

timing or exact words of the phone conversation, she remembers the event because it was so

distressing to her that she went straight home and called her mother.

It is significant to Jarell's credibility that Jarell testified she had known Ellison since

1996, and she worked for Direct Air from when it opened in 2007 until it closed in 2012, and

primarily reported to Ellison.   (Crim. No. ECF 101 at 167-69.)   She spoke to Ellison every day.

(*Id.* at 172.)   As the reservations supervisor, she worked six days a week, opening at 7:00 a.m.

and staying until 7:00 p.m., supervising up to 100 people.   (*Id.* at 174-75.)   Her testimony was

inconsistent with a person who would have left the office early in the day, leaving behind

stranded customers when all of their flights were cancelled, if she had not received a call from

Ellison telling her to leave.   Jarrell testified that the phone conversation she described with

Ellison was the last time she ever spoke to her, and Ellison has not described any other

conversation they had after Jarrell learned about the shut-down on the last day Direct Air was in

business.   (Crim. ECF No. 101 at 198.)   Ellison has not shown a reasonable probability that the

outcome of the trial would have been different if Ellison and Ulerup had denied the phone

conversation.

**g.**      **The relevance of the missing Direct Air bankruptcy documents**

Ellison submits that Penny Bly, who kept the Direct Air bankruptcy documents and

worked on accounting, "could have testified about missing docs and her Direct Air inaccurate

accounting."   H. Jessica Murphy, the bankruptcy trustee's counsel, "would have testified about

the destroyed documents and the hidden documents.   She would have had to come clean about

the time that the documents were destroyed and if and why she had these documents."   In light

of the problems in the defense theory discussed above, it is unlikely the result of the trial would

have been different if Ellison testified that Direct Air properly accounted for all of the

transactions in the escrow account in compliance with the DOT regulation, with the exception of

the errors caused by the Radixx system, but she could not prove this because the documents were

inadvertently destroyed by the bankruptcy trustee.

**h.**      **The relevance of Avondale's purchase of Direct Air**

According to Ellison, Avondale officers Jeff Conry, Wayne Greene, Hank Torbert and

Donald Stukes "would have testified against each other about intent for the company [Direct Air], and who was running what."   However, as the Government argued in its closing statement, the fraud alleged in this case occurred before Avondale bought Direct Air.   Besides, as discussed above, there was testimony that the escrow shortfall was much greater than the $5.4 million disclosed to Avondale, calling into question the defense theory that Direct Air was not responsible for any losses because Avondale accepted responsibility for the shortfall. Therefore, this proposed testimony would not have persuaded the jury.

## III.    CONCLUSION

Ellison's defense, with or without the proposed witness testimony, was dependent on the jury concluding, as a finding of fact, that the DOT regulation permitted (1) charter airlines to sell vouchers and take membership and luggage fees out of escrow before passenger flights had been completed; and (2) to withdraw from the escrow account without flight by flight accounting of the funds.   The jury rejected this argument and there is nothing about the proposed defense testimony that makes it a more persuasive in light of the DOT's position that voucher sales were never permitted and withdrawals from escrow required a flight by flight accounting.   The uncontradicted evidence of Direct Air's continuous losses and high fuel bills makes it unlikely the jury would believe the escrow shortage was caused solely by undiscovered computer errors and that there was no intent to deceive the banks.   Evidence of Ellison's involvement in running Direct Air makes it unlikely the jury would conclude she was not involved in the inflation of the year-end financial statements.   Factual allegations of prejudice are an essential component to a prima facie showing entitlement to habeas relief, and Ellison has not alleged sufficient facts to establish prejudice.   Therefore, an  evidentiary hearing is unnecessary. *Palmer v. Hendricks*, 592 F.3d

386, 400 (3d Cir. 2010) (prima facie showing of prejudice is required before an evidentiary hearing is necessary to determine and ineffective assistance of counsel claim on habeas review.) Therefore, for the reasons stated above, the amended § 2255 motion is DENIED.   An appropriate order follows.

## IV.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), the petitioner in a § 2255 proceeding may not appeal from the final order in that proceeding unless he or she makes "a substantial showing of the denial of a constitutional right."   "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Because jurists of reason could not disagree with this Court's conclusion that Ellison failed to establish the prejudice prong of her ineffective assistance of counsel claim, Ellison has failed to make a substantial showing of the denial of a constitutional right, and no certificate of appealability shall issue.

**Date:   June 7, 2022**

_____
Hon. Susan D. Wigenton,
United States District Judge